UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GORDON ALLEN WILSON,

Petitioner,

v.

PATRICK COVELLO,

Respondent.

No.  2:20-cv-0591 KJM DB P

FINDINGS AND RECOMMENDATIONS

Petitioner is a state prisoner proceeding through counsel with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his convictions and twenty-seven year sentence imposed by the Sacramento County Superior Court in 2014 for thirteen counts of committing a lewd act on a child.  Petitioner alleges his counsel was ineffective in violation of the Sixth Amendment and that jury instructions violated his right to due process.  For the reasons set forth below, this court will recommend the petition be denied.

**BACKGROUND**

## I.  Facts Established at Trial[1]

The California Court of Appeal for the Third Appellate District provided the following factual summary:

---

[1] This court provides a more detailed description of the trial evidence in the discussions of petitioner's claims below.

1

K.L.'s family lived next door to defendant and his wife, beginning in 2001. K.L. was born in 2005. The two families were close, and defendant was like a grandfather to K.L.

At times, when K.L. was alone with defendant playing board games, defendant hid dice in his pants and had K.L. reach in to retrieve them, touching his penis. He also lifted up his shorts and showed his "privates" to K.L. At other times, defendant changed his clothing in front of K.L. and asked her to look at his penis. On one occasion, defendant opened a pornographic website on the computer while K.L. was on his lap.

The charges in this case were based on incidents that occurred after K.L.'s sister was born in January 2013 until July 2013. Defendant gave K.L. what they called "VIP massages." This happened in his bedroom or in a boat that was parked on the side of the house. She testified that the massages happened 15 or 16 times in the bedroom and more than five times in the boat. During these massages, defendant removed K.L.'s clothing. He rubbed various areas of her body, including her chest and buttocks, as well as her vagina, both externally and internally. Once, defendant had K.L. massage his penis.

People v. Wilson, No. C078361, 2018 WL 2423751, at *1-2 (Cal. Ct. App. May 30, 2018).[2]

## II. Procedural Background

### A. Judgment and Sentencing

Petitioner was tried twice on thirteen counts of committing a lewd act on a child in violation of California Penal Code § 288(a). After deliberating for about three days,[3] the first jury was unable to reach a unanimous verdict. On April 2, 2014, the trial court declared a mistrial. (See ECF No. 26-1 at 221-23.)

On October 16, 2014, petitioner was again charged with thirteen counts of lewd acts on a child. (ECF No. 26-1 at 275-83.) After a second jury trial, on November 14, 2014 petitioner was convicted on all counts. (ECF No. 26-2 at 462-74.) The trial court sentenced petitioner to 27 years.

---

[2] Respondent lodged the relevant state court record. (See ECF No. 26.) The opinion of the Court of Appeal can also be found at ECF No. 26-12.

[3] Petitioner states that the first jury deliberated for five days. However, a review of the Clerk's Transcript shows that the jury deliberated only about an hour and a half during the last two days. (See ECF No. 26-1 at 216-18 (on April 1, 2014, jurors deliberate for about one hour before informing judge they are deadlocked); ECF No. 26-1 at 221-22 (on April 2, 2014, jurors deliberate for a half-hour before again informing the judge they are deadlocked).)

1        **B.  State Appeal and Federal Proceedings**

2              The California Court of Appeal affirmed the judgment and sentence in a reasoned opinion.

3    (ECF No. 26-12.)  The California Supreme Court denied the petition for review without

4    comment.  (ECF No. 26-14.)  Petitioner then filed a habeas petition in the state supreme court.

5    (ECF No. 26-15.)  In that petition, he raised ineffective assistance of counsel claims for the first

6    time and again raised the instructional error claim he had raised on appeal.  The California

7    Supreme Court denied the petition without comment.  (ECF No. 26-16.)

8              Petitioner, through counsel, filed the present federal petition for a writ of habeas corpus on

9    March 17, 2020.  (ECF No. 1.)  Respondent filed an answer (ECF No. 13) and petitioner filed a

10   traverse (ECF No. 25).

11            **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

12            An application for a writ of habeas corpus by a person in custody under a judgment of a

13   state court can be granted only for violations of the Constitution or laws of the United States.  28

14   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

15   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

16   U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

17            Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

18   corpus relief:

19            An application for a writ of habeas corpus on behalf of a person in
         custody pursuant to the judgment of a State court shall not be granted
20       with respect to any claim that was adjudicated on the merits in State court
         proceedings unless the adjudication of the claim –
21
         (1) resulted in a decision that was contrary to, or involved an
22       unreasonable application of, clearly established Federal law, as
         determined by the Supreme Court of the United States; or
23
         (2) resulted in a decision that was based on an unreasonable
24       determination of the facts in light of the evidence presented in the State
         court proceeding.
25

26            For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

27   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

28   Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

1   (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be

2   persuasive in determining what law is clearly established and whether a state court applied that

3   law unreasonably.'"  <u>Stanley</u>, 633 F.3d at 859 (quoting <u>Maxwell v. Roe</u>, 606 F.3d 561, 567 (9th

4   Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle

5   of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

6   announced."  <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013) (citing <u>Parker v. Matthews</u>, 567 U.S.

7   37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely

8   accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be

9   accepted as correct."  <u>Id.</u> at 64.  Further, where courts of appeals have diverged in their treatment

10   of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

11   <u>Carey v. Musladin</u>, 549 U.S. 70, 76-77 (2006).

12        A state court decision is "contrary to" clearly established federal law if it applies a rule

13   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

14   precedent on "materially indistinguishable" facts.  <u>Price v. Vincent</u>, 538 U.S. 634, 640 (2003)

15   (quoting <u>Williams</u>, 529 U.S. at 405-06).  "Under the 'unreasonable application' clause of §

16   2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

17   governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that

18   principle to the facts of the prisoner's case.'"  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)

19   (quoting <u>Williams</u>, 529 U.S. at 413); <u>Chia v. Cambra</u>, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A]

20   federal habeas court may not issue the writ simply because that court concludes in its independent

21   judgment that the relevant state-court decision applied clearly established federal law erroneously

22   or incorrectly.  Rather, that application must also be unreasonable."  <u>Williams</u>, 529 U.S. at 411;

23   <u>see also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Andrade</u>, 538 U.S. at 75 ("It is not

24   enough that a federal habeas court, in its independent review of the legal question, is left with a

25   firm conviction that the state court was erroneous." (Internal citations and quotation marks

26   omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

27   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

28   <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652,

4

664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), abrogated by Murray v. Schriro, 745 F.3d 999-1000 (9th Cir. 2014)[4]); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.).  Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record.  Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate."  Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable.  Id. at 1147.  Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

---

[4] In Kipp v. Davis, 971 F.3d 939, 953 n.13 (9th Cir. 2020), the Court of Appeals explained the effect of the decision in Murray on Taylor:

> In *Murray I*, we recognized that *Pinholster* foreclosed *Taylor*'s suggestion that an extrinsic challenge, based on evidence presented for the first time in federal court, may occur once the state court's factual findings survive any intrinsic challenge under section 2254(d)(2). *Murray I*, 745 F.3d at 999–1000. Kipp does not present an extrinsic challenge so *Murray I's* abrogation of *Taylor* on this ground is irrelevant here.

Similarly, in the present case, there is no extrinsic challenge based on evidence presented for the first time in federal court so Murray's limitation of Taylor is not relevant.

1    or where petitioner's factual allegations are entirely without credibility."  Perez v. Rosario, 459

2    F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

3            The court looks to the last reasoned state court decision as the basis for the state court

4    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

5    "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

6    a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

7    reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

8    banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

9    has been presented to a state court and the state court has denied relief, it may be presumed that

10   the state court adjudicated the claim on the merits in the absence of any indication or state-law

11   procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be

12   overcome by showing "there is reason to think some other explanation for the state court's

13   decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

14           Similarly, when a state court decision on a petitioner's claims rejects some claims but does

15   not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal,

16   that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 293

17   (2013).  When it is clear, that a state court has not reached the merits of a petitioner's claim, the

18   deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

19   must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099,

20   1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

21           If a petitioner overcomes one of the hurdles posed by section 2254(d), the federal court

22   reviews the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.

23   2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear

24   both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is

25   such error, we must decide the habeas petition by considering de novo the constitutional issues

26   raised.").  For the claims upon which petitioner seeks to present evidence, petitioner must meet

27   the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

28   basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

1 the presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S.
2 170, 186 (2011).

3                                      **ANALYSIS**

4          Petitioner raises two claims:  ineffective assistance of trial counsel and instructional error.
5 As discussed below, petitioner fails to show the California Supreme Court's denial of either claim
6 was contrary to, or involved an unreasonable application of, clearly established Federal law.  Nor
7 does he show the state court's decision was based on an unreasonable determination of the facts.
8 Because petitioner has not satisfied the requirements of 28 U.S.C. § 2254(d), the petition should
9 be denied

10 **I.  Ineffective Assistance of Counsel**

11         Petitioner contends his attorney rendered constitutionally ineffective assistance in three
12 ways.  First, petitioner argues his attorney failed to put on expert testimony that petitioner's
13 treatment for prostate cancer and subsequent erectile disfunction rendered him unable to form the
14 intent necessary for the crimes.  Second, petitioner contends his attorney failed to seek to exclude
15 pornographic images shown to the jury.  Petitioner further argues his attorney should have put on
16 an expert regarding the likelihood pornographic images would inadvertently appear on a
17 computer.  Third, petitioner contends his attorney should have sought to disqualify the trial judge
18 based on a conflict of interest.

19         **A.  Legal Standards for Ineffective Assistance of Counsel Claims**

20         To establish his trial attorney rendered ineffective assistance in violation of his Sixth
21 Amendment rights, petitioner must show counsel acted unreasonably and, if counsel had acted
22 reasonably, there is a reasonable probability the result of the trial would have been different.
23 Strickland v. Washington, 466 U.S. 668, 687 (1984).  A reasonable probability is "a probability
24 sufficient to undermine confidence in the outcome."  Id. at 694.  "The likelihood of a different
25 result must be substantial, not just conceivable."  Richter, 562 U.S. at 112.

26         **B.  Relevance of Counsel's Disciplinary Proceedings**

27         Initially, this court addresses the relevance, if any, of petitioner's trial counsel's discipline
28 by the state bar.  Petitioner explains that based on charges filed in June 2014, his attorney was

                                          7

1    disciplined for conduct in another case.  Petitioner contends his attorney's conduct during trial

2    was similar to his attorney's conduct in the state bar's disciplinary action.  Petitioner states these

3    similarities support his argument that counsel acted unreasonably in the present case.

4         Petitioner provides exhibits from the 2014 state bar proceedings.  They show that in 2012

5    petitioner's counsel stipulated that he failed to file an appellate opening brief, failed to inform his

6    client about that failure, and was initially dishonest with the client's wife about the status of the

7    appeal.  (ECF No. 1-1 at 27-29.)  Counsel also stipulated in that proceeding that in 2007 he

8    received a public reproval from the state bar for failure to respond to client inquiries and failure to

9    timely reimburse a client for unused funds.  The state bar recommended that counsel be required

10   to participate in an alcohol treatment program.  (Id. at 17-18.)  It further recommended that once

11   counsel had completed that program, he be suspended from the practice of law for one year,

12   subject to a stay of that suspension during a two-year period of probation.  (Id. at 20-21.)

13        To the extent petitioner's counsel's disciplinary proceedings are relevant to his claims in

14   this case, this court would only consider them in determining whether counsel acted reasonably.

15   Counsel's inappropriate conduct with respect to other clients could have relevance in

16   understanding counsel's behavior in the present case.  However, counsel's conduct with respect to

17   other clients is not relevant to the court's analysis of prejudice.  The prejudice analysis assumes

18   counsel acted unreasonably and requires the court to determine whether, had counsel acted

19   reasonably, there is a reasonable probability the result of the trial would have been different.

20   Strickland, 446 U.S. at 687.

21        Below, this court examines only the prejudice prong of the Strickland test.  The Ninth

22   Circuit has held that limiting review of an ineffective assistance of counsel claim to the prejudice

23   prong is permissible where the determination of prejudice is determinative.  A reviewing court

24   "need not determine whether counsel's performance was deficient before examining the prejudice

25   suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an

26   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

27   followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

28   697), amended and superseded on other grounds, 385 F.3d 1247 (9th Cir. 2004); United States v.

8

Ray, No. 2:11-cr-0216-MCE, 2016 WL 146177, at *5 (E.D. Cal. Jan. 13, 2016) (citing Pizzuto, 280 F.3d at 954).

Because this court finds the issues of counsel's reasonableness more complex than the issues of prejudice, this court addresses only the prejudice issues below.  Therefore, this court need not consider the extent, if any, to which petitioner's trial counsel's disciplined conduct is relevant to the ineffective assistance of counsel analysis.

### C.  Decision of the State Court

Petitioner raised his ineffective assistance of counsel claims in his petition for a writ of habeas corpus to the California Supreme Court.  Because the California Supreme Court denied the claims without comment, the federal court "must determine what arguments or theories . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Richter, 562 U.S. at 102.

### D.  Failure to Investigate and Present Evidence of Medical Condition

Petitioner argues that one important aspect of his defense was challenging whether he had the intent required for the crimes.  Penal Code § 288(a) required the state to prove that petitioner "willfully and lewdly commit[ed] any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."  Petitioner contends counsel failed to investigate and present evidence that petitioner lacked sexual desire and, therefore, could not have formed the necessary intent.

#### 1.  Background

##### a.  Petitioner's Medical History and Communications with Counsel

Petitioner provides the court with a declaration from his wife, Lynn Wilson.  Ms. Wilson states as follows.  In 2001, petitioner was diagnosed with prostate cancer.  He told Ms. Wilson at that time that he had a lack of "sexual feeling and libido."  Those feelings became more pronounced after petitioner had a biopsy in 2002.  In 2003, petitioner's cancer was treated with

9

proton beam therapy.  Later in 2003, when Ms. Wilson was present, petitioner informed Dr.
Hopper, his primary care physician, that he had diminished sensation and was unable to achieve
an erection.  Dr. Hopper prescribed him medications for erectile disfunction; they were
unsuccessful.  Around this time, petitioner and his wife watched pornographic movies in the hope
of arousing him, but they also had no effect.  (ECF No. 1-1 at 2-5.)

After they retained attorney Jesse Soto Ortiz, III, to represent petitioner, Ms. Wilson asked
the attorney numerous times to contact Dr. Hopper.  At some point, Mr. Ortiz admitted to her that
he had not done so.  During the second trial, Mr. Ortiz told Ms. Wilson he would subpoena the
doctor.  (ECF No. 1-1 at 5-6.)

Ms. Wilson references documents regarding petitioner's medical condition and lack of
sexual feeling that she states are attached to her declaration.  Ms. Wilson provided those
documents to Mr. Ortiz "during the earliest stages of trial preparation."  According to Ms.
Wilson, those documents include a letter from petitioner's doctor about petitioner's medical
condition and the side effects of the proton beam treatment.  The letter from the doctor was based
on questions suggested by Mr. Ortiz.  However, counsel told her the letter was unhelpful and they
needed a medical expert on erectile disfunction.  (ECF No. 1-1 at 5-6.)

No documents are attached to the copy of Ms. Wilson's declaration submitted to the
court.[5]  Even if they had been, this court finds they would not be material to the analysis here.
There was no dispute that petitioner suffered from erectile disfunction or that he told his doctor he
lacked sexual desire and feeling.  Further, neither respondent nor petitioner's trial attorney dispute
the existence of these documents or that they were provided to the trial attorney.

When she asked about the evidence of pornography the prosecution intended to present,
Mr. Ortiz told Ms. Wilson the prosecution's evidence of pornography on petitioner's computer
was "miniscule."  He also rejected family members' requests that he employ experts on both
petitioner's medical condition and regarding the pornography.  (ECF No. 1-1 at 6.)

////

---

[5] The documents are also missing from the copy of Ms. Wilson's declaration attached to
petitioner's habeas petition lodged with this court.  (ECF No. 26-15.)

1      Petitioner also provides the court with a declaration from Dr. Hopper.  Dr. Hopper states

2  that after petitioner's treatment for prostate cancer, he told her he had a "total loss" of libido or

3  sexual desire and was experiencing erectile disfunction.  She prescribed medications for erectile

4  disfunction; petitioner reported that they did not work, which Dr. Hopper attributed to the fact the

5  medications do not affect a lack of sexual sensation.  (ECF No. 1-1 at 9-10.)

6      Dr. Hopper states that she told Ms. Wilson she would be willing to speak with petitioner's

7  counsel.  Neither counsel nor his representatives contacted Dr. Hopper or returned the two

8  telephone calls she made to him.  Dr. Hopper never received a subpoena to appear at either of

9  petitioner's trials.  (ECF No. 1-1 at 10-11.)

10      Finally, petitioner provides the declaration of attorney Ortiz.  Mr. Ortiz states that

11  petitioner and his wife "repeatedly" asked him to contact Dr. Hopper.  He does not recall what

12  attempts, if any, he made to contact the doctor.  Mr. Ortiz also does not recall:  (1) whether he

13  told Ms. Wilson he intended to subpoena Dr. Hopper; (2) whether Ms. Wilson gave him a letter

14  from Dr. Hopper; (3) whether he provided Ms. Wilson with specific questions to ask Dr. Hopper;

15  or (4) whether he told Ms. Wilson petitioner needed a medical expert on erectile disfunction.

16  (ECF No. 1-1 at 13-14.)

17      Mr. Ortiz does state that he never contacted an expert regarding either petitioner's medical

18  conditions and their effects or regarding the pornography found on petitioner's computer.  (ECF

19  No. 1-1 at 14-15.)

20      **b.  Court Proceedings before Trial**

21      Prior to trial, the prosecution requested exclusion of any references to petitioner's

22  diagnosis and treatment for prostate cancer and any other health ailment or condition.  Mr. Ortiz

23  responded that "the only issue with that. . . is that we will be presenting evidence, both through

24  Mr. Wilson and his wife, that he suffers from erectile dysfunction, which is the result of the

25  cancer. That's how the condition began.  So I think it is relevant to explain when this began and

26  how it's impacted his sex drive, and I think the jury should hear that."  (ECF No. 26-6 at 11.)

27      The trial judge held that petitioner "can testify as to -- because I have erectile dysfunction,

28  I have no sex drive. I have no desire for sex. I don't feel anything as far as that's concerned."

1    (ECF No. 26-6 at 14.)  She further held, "I think he can testify as to his physical state, but

2    anything beyond that, then, I think gets into the realm of expert testimony."  (Id.)  In the absence

3    of expert testimony, the court concluded, "[petitioner] can't draw the connection" between his

4    physical condition and physical sensations and the lack of criminal intent. (Id. at 15.)

5         The trial judge also expressed "concern about the lack of any kind of medical testimony or

6    expert testimony [] from which a jury could conclude that the erectile dysfunction leads to a lack

7    of sex drive or sexual gratification."  The judge was concerned that the jury "could be misled in

8    the absence of any kind of medical testimony or expert testimony that could lead a jury to believe

9    that because of the erectile dysfunction, he lacked the requisite intent."  (ECF No. 26-6 at 14.)

10        The trial judge concluded by making clear that the prosecution was free to argue the

11   defense's lack of any expert testimony connecting erectile disfunction to criminal intent.  (ECF

12   No. 26-2 at 15.)

### c. Prosecution's Evidence at Trial

### i. Victim's Testimony

15        The victim testified that after petitioner showed her his "private area" on the drive home

16   from a restaurant in July 2013, he told her not to tell her parents.  However, when she got out of

17   the car, she told her parents about it because "it was going on too much and I'm like, okay, this is

18   gonna end."  (ECF No. 26-6 at 201; see also ECF No. 26-6 at 136-42, 145-47.)  She testified that

19   a number of times when she and petitioner played games he would put the dice in his underwear

20   and she would reach in to get them.  In doing so, she touched his "privates."  (Id. at 142-43.)

21   Petitioner also showed her his penis "more than five" times.  (Id. at 143-45.)

22        Petitioner gave the victim massages during which he massaged her "all over" under her

23   clothes, including touching her "private area," chest, and bottom.  (ECF No. 26-6 at 174-77, 182-

24   86.)  Sometimes petitioner would remove her clothes to give her a massage.  (Id. at 179, 184-85.)

25   Petitioner gave her a massage "more than five" times.  (Id. at 180.)   She also gave him massages.

26   During one, he asked her to touch is penis and she did over his clothes.  He encouraged her to do

27   it longer because he liked it.  (Id. at 186-89.)  His penis felt "mushy."  (Id. at 195.)  The massages

28   took place on petitioner's boat and his bedroom.  (Id. at 178-79.)

The victim testified that once she told petitioner to take off all his clothes.  He did so.
While he had his clothes off, petitioner lay down like he was taking a nap.  (ECF No. 26-6 at 196-98.)  She never saw him naked in the shower.  (Id. at 199.)

The victim testified that petitioner never told her not to tell anyone about what happened
between them.  (ECF No. 26-6 at 262-63.)  She also testified that she liked going to petitioner's
house and was never afraid to go there.  (Id. at 237.)

### ii.  Testimony of Victim's Parents

The victim's mother testified that the victim told her petitioner had shown the victim his
"pee pee" while the victim's family, petitioner, and his wife were in the car on July 31, 2013.
(ECF No. 26-6 at 76.)  She went on to tell both parents that petitioner had touched her vaginal
area and that he gave her massages.  (Id. at 77, 122.)  She also told them petitioner had not told
her to touch his penis.  (Id. at 122.) The victim's mother felt that the victim and petitioner had had
a good relationship and the victim never seemed worried or upset about that relationship.  (Id. at
63-64, 106-07.)

The victim's father testified that after the drive home from the restaurant, the victim asked
him to "tell Allen to quit showing me his privates."  (ECF No. 26-6 at 297.)  The victim also told
him she and petitioner would have VIP massages and that he touched her privates.  (Id. at 298.)

Detective Galovich testified that she arranged for the victim's father to make a "pretext
call" to petitioner on August 15, 2013.  (ECF No. 26-6 at 418.)  A pretext call "is a tool to elicit
information from the suspect and understand their possible involvement or lack of involvement
regarding the crime."  (Id.)

### iii.  Pretext Call

A tape recording of the pretext call was played for the jury.  The jury was also provided a
transcript of the call.  (See ECF No. 26-6 at 311-12.[6])  During that call, the victim's father told
petitioner the victim told him the following:

---

[6] The jury was told that the transcript was not evidence but a tool to help them follow the audio
tape.  Because there is no indication the transcript is not a true account of the conversation had
during the call, this court considers it here.  The transcript can be found in the Clerk's Transcript,
ECF No. 26-2 at 5-19.

- Petitioner had shown her his penis by pulling up his shorts when they were in the car returning from the restaurant on July 31, 2013.

  Petitioner said he had been pulling down his shorts to cover his underwear. He told the victim's father "I apologize for that.  That was . . . my fault, my mistake."

- Petitioner told the victim not to tell her parents.  Petitioner's father also said the victim's mother had heard petitioner say that.

  Petitioner said, "I don't believe I said that . . . never said that to her at all about anything."

- This, apparently referring to petitioner's direction to the victim not to tell her parents, happened numerous times.

  Petitioner replied, "whatever she says is fine."  He continued, "I've never told her not to tell you or anybody about anything that we've done together- here at·the house."

- Petitioner and the victim played board games.  During those games, petitioner would put the dice in his underwear.

  Petitioner responded, "Uh, yes. I have done that to hide - hide them from her. So that's true. But then I also stand up so the dice drops out."  He said he had done it three or four times.

- Petitioner would tell the victim to "grab' em (the dice) out of there."

  Petitioner told the victim's father, "No.  I stand up so it drops out.  So again bad judgment on my part I – I agree."  Later in the call petitioner said that once the victim had tried to get the dice out of his shorts.  She "jumped on his leg" and then started putting her hand in his shorts to look for the dice.  He said he "immediately stopped that" and told her it was not appropriate.

- Petitioner and the victim would have "VIP" massages in the cabin of petitioner's boat.

////

14

1      Petitioner said the victim had asked him to give her a VIP massage like

2  what his wife gave her.  He explained that there was "nothing wrong or bad going

3  on."  He told the victim's father to ask his wife who had "come out there several

4  times when we've been on the boat."  Petitioner described the VIP massage as

5  being on the victim's skin "[o]n her legs and her arms. Uh, she does pull up her

6  chest or her shirt so we rub her chest. But, you know, since she doesn't have any

7  boobs I didn't think that would be a problem. If it is·then I apologize." ...When the

8  victim's father said she'd told him it was "a little bit more than that," petitioner

9  responded, "I don't think so . . . I don't know why she would say something like

10  that."  Petitioner said the VIP massages happened twice.

11  • Petitioner would massage the victim on her bottom.

12      Petitioner admitted that he did so.  He said she had her underwear on and

13  "that's as far as it goes."

14  • Petitioner touched her vagina.

15      Petitioner responded, "I don't think so.  I have no need for that."

16  • Petitioner had been naked in front of her.

17      Petitioner said that had happened three times.  He then described two

18  times.  First, he was holding the victim upside down and she pulled down his

19  shorts.  Petitioner said the victim's mother was told of this incident.  Second, he

20  told the victim to watch TV while he took a shower.  The victim came into the

21  bathroom, pressed her bare bottom against the shower door, and opened the door.

22  Petitioner yelled at her to get out and, when he got out of the shower, sent her

23  home.  He said he instructed her to tell her parents about the incident.  He also told

24  her, "It'll between – between you and me since we've talked about it that we're

25  not going to do that."  Petitioner said he left it up to her to decide what to do.

26  Petitioner said the victim told him she was afraid to tell her parents because they

27  would get angry with her.

28  ////

15

- The victim had massaged petitioner.

Petitioner explained that he and the victim were bouncing on the bed. He was wearing shorts. The victim started rubbing his "private areas." Petitioner said he told her it was "not appropriate. We don't do these kind of things." He told the victim's father that was the only time the victim tried to touch his penis. He apologized to the victim's father for not telling her parents about the incident. Petitioner said he told the victim to tell them.

- Petitioner's wife is "always" gone when "this stuff goes on."

Petitioner responded that "99% of the time that we've been on the boat, [his wife's] been there." He added that his wife had "come out a couple times when we've been on the boat."

### iv. SAFE Interview

The victim was interviewed by a SAFE[7] officer, a child abuse detective, after she told her parents about the abuse. The SAFE interview was video recorded. That recording was played for the jury and jurors were provided a transcript to review while they watched the video.[8] (ECF No. 26-6 at 420.) During that interview, the victim said petitioner had touched many parts of her body under her clothes including her chest, vagina, and bottom during "VIP" massages. (ECF No. 26-2 at 48-54, 66-67.) She said petitioner had given her a VIP massage "maybe 50 or 60 times." (Id. at 59.) She massaged petitioner's private area once. (Id. at 55, 62.)

The victim also said she had seen petitioner's penis "like 100 times." (ECF No. 26-2 at 31, 34, 37, 46, 58-59.) She described petitioner showing her his penis in the car in July 2013 and telling her not to "tell on him." (Id. at 35-36.) The victim also described playing board games with petitioner. He would hide the dice in his shorts and she would have to reach in and get them. She "accidentally" touched his private area. It felt "mushy." (Id. at 41.)

---

[7] SAFE stands for Sexual Assault Forensic Examination. (ECF No. 26-6 at 414.)

[8] Like the transcript of the pretext call, the transcript of the videotape was not evidence. Because there is no challenge to its accuracy, this court has reviewed the transcript to determine what the jury saw and heard. The transcript can be found in the Clerk's Transcript at ECF No. 26-2 at 25-85.

A physical exam conducted at that time showed nothing of significance.  (ECF No. 26-6 at 397.)  The examiner testified that those results were not inconsistent with the allegations of sexual abuse made by the victim.  (Id. at 395-96.)

### d.  Defense Evidence at Trial

#### i.  Testimony re Intent

Petitioner testified on direct examination that he did not feel his conduct with the victim was inappropriate and he was never sexually aroused by any activity with the victim.  (ECF No. 26-7 at 150.)

During cross-examination, the prosecutor asked whether petitioner had seen the video of the SAFE interview in which the victim described petitioner's penis as feeling "mushy."  The prosecutor then asked whether petitioner had erectile disfunction.  Petitioner replied that he did.  (ECF No. 26-7 at 201.)

On redirect, petitioner's counsel first questioned petitioner about erectile disfunction.  Petitioner testified that he had been suffering from erectile disfunction since 2003.  "I don't have a sex drive. It's basically diminished. I have no sexual interest whatsoever. On a scale of one to ten, ten being high, one being low, it would be a one or a zero."  (ECF No. 26-7 at 293.)  Petitioner had tried medication for erectile disfunction, but it was unsuccessful.  He then turned to pornography, which he viewed one to several times each year from 2008 to 2013.  Viewing pornography did not help him achieve an erection.  (Id. at 294, 303-06.)  He continues to suffer from erectile disfunction.  (Id. at 294-95.)

Petitioner's wife also testified.  She testified that she and petitioner had watched X-rated movies.  (ECF No. 26-7 at 352-53.)  She also testified that she was unaware whether petitioner looked at pornography on the computer.  (Id.)  She did not testify about petitioner's erectile disfunction or any physical symptoms he experienced regarding their sexual relationship.

Neither petitioner's doctor nor any expert testified for the defense.

#### ii.  Defense Testimony re Charged Acts

The primary evidence for the defense was petitioner's testimony summarized here.  Petitioner admitted touching the victim's chest and bottom during massages, but denied touching

17

her vagina.  (ECF No. 26-7 at 148-52, 155-56.)  He testified the victim removed her pants and described the massages as brief.  (Id. at 146, 148-52.)  Once when she gave him a massage, she started massaging his "crotch area" and he told her to stop.  (Id. at 152-53.)

When petitioner and the victim played games, he would occasionally hide the dice just under the leg of his shorts.  He would remove the dice.  One time, the victim "threw the dice in my shorts" and then tried to pull them out.  He told her that was "not acceptable."  (ECF No. 26-7 at 163-69.)  During the pretext call, however, petitioner told the victim's father he put the dice in his "underwear."  (Id. at 167-69.)  He testified that was not accurate and he had put them in his bike shorts.  (Id. at 167.)

The victim had seen petitioner naked two or three times.  He described one time when she unexpectedly entered the bathroom while he was in the shower. (ECF No. 26-7 at 177-79.)  After several incidents, petitioner told the victim to tell her parents what had happened.  (Id. at 179.)  However, he never talked with the victim's parents about the victim seeing him in the shower.  (Id. at 179, 187.)

With respect to the incident in the car in July 2013, petitioner testified on direct that the victim told him she could see his underwear.  He saw that his underwear was sticking out the leg of his shorts so he pulled his shorts down over it.  He did not show the victim his penis and doubted she could have seen it.  After that happened, he told the victim she should tell her mom about it. (ECF No. 26-7 at 184-86.)  As they were getting out of the car, he told the victim, "you didn't tell your mom did you?"  She said "no."  (Id. at 186.)

The defense also put on several witnesses, including petitioner's son and granddaughter, who testified to petitioner's good character and his appropriate conduct with children.

### 2.  Discussion of Ineffective Assistance of Counsel re Evidence of Petitioner's Medical Background

Petitioner presents evidence regarding the first factor of the Strickland test – whether counsel acted reasonably.  The declarations of Ms. Wilson, Dr. Hopper, and Mr. Ortiz relate almost solely to counsel's failure to investigate or present the testimony of Dr. Hopper or of any

////

expert to connect petitioner's medical condition to an inability to form the intent to "arous[e], appeal[] to, or gratify[] [his] lust, passions, or sexual desires."

Petitioner's presents very little evidence to address Strickland's prejudice factor.  To demonstrate he suffered prejudice as the result of counsel's failures, petitioner must establish that there is a reasonable probability the result of the proceedings would have been different had counsel investigated and presented Dr. Hopper's and/or an expert's testimony.  Petitioner provides the court with no evidence about how an expert might have testified or even that there are any experts who could have supported the defense's position that petitioner lacked intent.  He provides only the declaration of Dr. Hopper.  Dr. Hopper could have testified that petitioner told her he had a "total" lack of libido and sexual desire.  She also could have testified that she diagnosed petitioner with erectile disfunction and that he reported that the medications prescribed did not help.

The prosecution did not challenge petitioner's testimony that he had erectile disfunction and lacked sexual desire.  Therefore, any testimony from petitioner's doctor about erectile disfunction or petitioner's professed lack of libido would have had little impact.  Dr. Hopper simply confirmed those facts.  She made no connection between petitioner's lack of libido and any attempts he might make to increase his libido.  It is not reasonably probable that the statements in Dr. Hopper's declaration would have lead the jury to conclude that petitioner might not try to arouse his sexual desires by molesting a child.

Even if Dr. Hopper's statements could be considered impactful, they would have been countered by significant other evidence.  The victim testified to specific acts of molestation.  Her testimony was corroborated in large part by the testimony of her parents and her statements in the SAFE interview.  Petitioner also admitted that some of the incidents she described had occurred, but most had not gone as far as the victim described.

There was ample evidence for the jury to conclude that petitioner committed the acts charged.  It would reasonably follow that touching the victim's body, showing her his penis, and encouraging her to touch it would have been done for the purpose of sexual arousal. While petitioner may not have been able to achieve an erection, it does not necessarily follow that he

1   wouldn't have attempted to do so.  He testified that sexual arousal was the purpose of watching

2   pornography, which he had admittedly watched in early 2013, the same time period some of the

3   charged conduct occurred.

4          The jury in petitioner's first trial was deadlocked after deliberating for about three and a

5   half days.  Petitioner argues that because the jury in petitioner's first trial was deadlocked, the

6   case was a close one.  This court agrees that the fact the first jury was unable to reach a verdict is

7   relevant.  Further, it appears that the issue the jury found difficult was petitioner's intent.  After

8   informing the judge they were deadlocked, the judge invited the jury to submit questions or ask

9   for additional argument.  When they did, they asked for argument on the issue of petitioner's

10  intent.  (See ECF No. 26-1 at 218.)

11         The fact the first jury was deadlocked is insufficient to cause this court to conclude the

12  state court's denial of this ineffective assistance of counsel claim was unreasonable.  Petitioner's

13  argument would be stronger if he showed that the evidence at both trials was largely the same or

14  that the prosecution presented a weaker case the second time.  Had petitioner made one of those

15  showings, then counsel's errors in the second trial may have been more likely to affect the

16  verdict.

17          Petitioner bears the burden of demonstrating prejudice.  Richter, 562 U.S. at 104.  This is

18  a particularly high bar where § 2254(d) requires the federal court to defer to the state court's

19  determination.  Id. at 101.  In any event, the prosecution's case at the second trial was not so

20  lacking in evidence of intent that the jury could not have reasonably found petitioner had the

21  requisite intent.  The first jury's deadlock does not cause this court to conclude that the California

22  Supreme Court's denial of petitioner's claim was "so lacking in justification that there was an

23  error well understood and comprehended in existing law beyond any possibility for fairminded

24  disagreement."  Richter, 562 U.S. at 103.

25         Petitioner fails to show a reasonable probability that absent counsel's errors, the result of

26  the trial would have been different.  The California Supreme Court's denial of petitioner's claim

27  that his counsel was constitutionally ineffective was not contrary to or an unreasonable application

28  of clearly established federal law.

**E.  Failure to Object to Admission of Pornographic Images and Video**

Images from a xHamster.com, a pornographic website that had been accessed on petitioner's computer, were shown to the jury.[9]  (ECF No. 26-7 at 371.)  Petitioner argues his counsel was constitutionally ineffective for failing to object to admission of the evidence.

**1.  Trial Testimony**

The victim testified as follows.  Once when she was using petitioner's computer, petitioner walked in.  She closed out the page she was on because she thought petitioner might need the computer.  (ECF No. 26-6 at 275-76.)  Petitioner sat down with her and typed in a website called xHamster.com.  She was sitting on his lap when he did so.  (Id. at 211-14, 274-76.)  There were "sex videos" she and petitioner watched on the website.  The victim described what she saw with some specificity.  (Id. at 215-16.)  At various times, the victim testified that the xHamster site "popped up" rather than stating that petitioner typed in the site name.  (Id. at 272-78.)  She also testified that the site popped up by accident.  (Id. at 285.)

During the SAFE interview, the victim said petitioner "accidentally" opened a website called xHamster that had "bad videos."  The victim described sexual activity she saw on the site at that time.  (ECF No. 26-2 at 71-73.)

Petitioner testified that in the summer of 2013 he and the victim were at the computer.  She was sitting on his lap.  He asked her to find the page she had just been on.  She was controlling the mouse and keyboard.  A pornographic site then "popped up."  He told the victim to delete the page.  Instead, she clicked on something that went to another pornographic image.  Petitioner grabbed the mouse and closed the program.  He told the victim that it was not appropriate to look at things like that.  He did not tell her parents what happened.  (ECF No. 26-7 at 174-76.)

---

[9] The record is not entirely clear what the jury was shown.  They were shown still images from the video.  (See ECF No. 26-7 at 370.)  A question from the prosecutor indicates the video was fast-forwarded to one image.  However, the court reporter's note states that "videotape was played."  For purposes of this analysis this court assumes the jury saw both a pornographic video and still images.  This court uses the term "images" to refer to both mediums.  However, this court also notes that neither party has indicated where, if at all, in the record this evidence appears.

21

During the pretext call, the victim's father said the victim "was telling me one time you were playing on the computer and you brought up a Web site called xHamster.com and it's a porn site." Petitioner responded, "Uh, yeah." He then said a porn site had popped up another time when the victim's mother had been using his computer to access a cosmetics website. When the victim was using the computer on a "child's program" a porn site "popped up" again. Petitioner told the victim's father he was "welcome to have someone come over – come over here and run·a history of uh, whatever you want on my computer. And you will not see that kind of crap where I've actually gone in and looked for·them or searched for them." (ECF No. 26-2 at 13-15.)

A detective with the Sheriff's High-Tech Crimes Task Force testified that she examined the hard drive on petitioner's computer. (ECF No. 26-7 at 19.) She found access to the website xHamster in the internet history. (Id. at 21, 25, 29.) The detective found some still photos on the computer from xHamster and confirmed that some were taken from videos. (Id. at 30-39.)

The detective testified that she could determine that xHamster had been accessed in 2013 and that a video from that site had been seen on March 5, 2013. However, she could not determine whether the site had been accessed in the summer of 2013. (ECF No. 26-7 at 56-57, 59, 63-65.)

The detective also determined that a computer cleaning program was used on August 15, 2013. (ECF No. 26-7 at 23.) She could not tell whether the program was "run" or whether someone actively chose to run it at that time. (Id. at 24, 58.) Even though the cleaner had been used, the detective could tell that a game site used by the victim and xHamster had been accessed on the computer. (Id. at 63.)

Petitioner testified that on August 15, 2013, he activated a computer cleaner to clear out his internet history. (ECF No. 26-7 at 274.) Petitioner did not deny that he had done so on the same day he spoke with the victim's father on the pretext call. (Id.) He admitted that during that call he told the victim's father "you wouldn't find that kind of crap on my computer." (Id.) He further testified that the cleaner only deleted the "recycle bin" on the computer and not his internet search history. (Id. at 275, 290.)

////

Petitioner testified that he recalled viewing pornography on his computer as recently as 2012 and then agreed that he viewed a video on March 5, 2013.  (ECF No. 26-7 at 267, 306.)  He also testified that he had viewed pornographic images on xHamster.com.  (Id. at 268.)  Petitioner testified the purpose of watching pornography was sexual arousal.  (Id. at 293-94, 306.)

### 2.  Discussion

Petitioner argues that his counsel should have objected to admission of the images and video.  He further argues counsel should have investigated and presented the testimony of an expert "to refute the district attorney's witnesses on the likelihood that the video had been inadvertently accessed or that the computer had been very recently cleaned and not periodically cleaned."

Again, whether or not petitioner's attorney acted reasonably, petitioner fails to demonstrate prejudice.  With respect to the absence of expert testimony, petitioner does not provide any evidence that an expert would or could have testified about the likelihood the video was inadvertently accessed or regarding the computer cleaning.  Further, the prosecution's computer expert testified that it is possible a pop-up video might appear on a computer screen.  Petitioner does not explain how any defense expert would have testified differently on that point.  Without evidence about how an expert would have testified, this court cannot find petitioner was prejudiced by the absence of an expert.

With respect to the introduction of the pornographic images, petitioner did not dispute at trial, and does not dispute here, that those images came from websites accessed on petitioner's computer.  Further, as described above, petitioner testified that his computer had been used to access the xHamster.com website, that he had viewed pornography on that site, and on other pornographic sites, for the purpose of attempting to arouse himself sexually.  Those facts alone were sufficient for the jury to find petitioner could form the intent necessary for the crimes.  Even if the images shown to the jury were unnecessary, petitioner fails to show they were sufficiently prejudicial to affect the outcome of trial.  Petitioner does not establish that he was prejudiced by counsel's failure to object to the video, much less that the California Supreme Court's rejection of his ineffective assistance of counsel claim was unreasonable.

**F.  Failure to Move to Recuse Trial Judge**

Petitioner argues that during the first trial, Judge Chang disclosed that her child had been sexually abused.  However, in the second trial, Judge Chang did not provide that information.  Petitioner argues his counsel unreasonably failed to seek to recuse Judge Chang.

Petitioner's claim is based on a mistake.  Judge Chang did not preside over the first trial.  Rather, a different judge did so and provided the information about his child to the parties.  (See ECF No. 26-4 at 77-78.)  Petitioner's constitutional claims are limited to the proceedings in the second trial.  Petitioner's refusal to acknowledge the error in his traverse is not well taken.  (See ECF No. 25-1 at 20 ("Even assuming that it was [the other judge's], not Judge Chang's, child who was the victim of sexual assault . . . .")).  In addition, he provides nothing to back up his claim that trial counsel was obligated to investigate "any potential spillover effect this may have had on the other judges of the same bench" (id.) or that petitioner was prejudiced by any such failure.

Petitioner's contention that his attorney was constitutionally ineffective when he failed to seek to recuse the trial judge should be denied.

**II.  Instructional Error**

Petitioner argues that one jury instruction removed the intent requirement of Penal Code §288(a).  Therefore, he continues, that instruction conflicted with other instructions specifying that an intent finding was required.  According to petitioner, the ambiguity created by that conflict violated his right to due process.

**A.  Elements of the Crime**

Penal Code § 288(a) states in relevant part:  "a person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony."

////

////

24

1    The jury was instructed that a violation of § 288(a) requires proof of two elements:

2    conduct and intent.  (ECF No. 26-8 at 101.)  The detailed instruction mirrored the language of §

3    288(a).

4    **B.  Relevant Instructions**

5        The People must prove not only that the defendant did the acts
         charged, but also that he acted with a particular intent. The
6        instruction for the crime explains the intent required.

7    (ECF No. 26-8 at 91; ECF No. 26-2 at 146 (CALCRIM 225).)

8        The crimes charged in this case requires [sic] proof of the union or
         joint operation of act and wrongful intent.
9
         For you to find a person guilty of the crimes of a lewd and lascivious
10       act on a child under 14 years, that person must not only intentionally
         commit the prohibited act or intentionally fail to do the required act,
11       but must do so with a specific intent. The act and specific intent
         required are explained in the instruction for that crime.
12

13   (ECF No. 26-8 at 94; ECF No. 26-2 at 148 (CALCRIM 251).)

14       The People are not required to prove that the defendant had a motive
         to commit any of the crimes charged. In reaching your verdict you
15       may, however, consider whether the defendant had a motive.

16       Having a motive may be a factor tending to show that the defendant
         is guilty. Not having a motive may be a factor tending to show the
17       defendant is not guilty.

18   (ECF No. 26-8 at 100; ECF No. 26-2 at 453 (CALCRIM 370).)

19       To prove that the defendant is guilty of this crime, the People must
         prove that: . . . [¶] The defendant committed the act with the intent
20       of arousing, appealing to or gratifying the lust, passions or sexual
         desires of himself or the child[.]
21

22   (ECF No. 26-8 at 101; ECF No. 26-2 at 155 (CALCRIM 1110).)

23   **C.  Legal Standards**

24   To obtain relief on federal habeas corpus review based on instructional error, a petitioner

25   must show that the error "'so infected the entire trial that the resulting conviction violates due

26   process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991)(quoting Cupp v. Naughten, 414 U.S. 141,

27   147 (1973)); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004); Hendricks v. Vasquez, 974

28   F.2d 1099, 1106 (9th Cir. 1992).  The standard for determining whether a petitioner is entitled to

1    relief is whether the error "had substantial and injurious effect or influence in determining the

2    jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Fry v. Pliler, 551 U.S. 112,

3    121–22 (2007) (on federal habeas review, the Brecht standard applies whether or not the state

4    court has applied harmless error analysis under Chapman v. California, 386 U.S. 18 (1967)).

5                **D.  Decision of the State Court**

6            Petitioner raised this claim on appeal.  Because the California Supreme Court denied

7    petitioner's petition for review without comment, the decision of the California Court of Appeal

8    is the last reasoned opinion of a state court and the one the federal court considers under 28

9    U.S.C. § 2254(d).  The Court of Appeal held:

10               Defendant contends the trial court erred by instructing the jury using
11           CALCRIM Nos. 370 and 1110. CALCRIM No. 370 provides that
             motive is not an element of the crimes charged, and CALCRIM No.
12           1110 provides that an element of committing a lewd act on a child (§
             288(a) ) is that the defendant committed the act with an intent to
13           sexually arouse or gratify himself or the victim. Defendant asserts
             that motive and intent are synonymous, so CALCRIM No. 370
14           negated the intent element of CALCRIM No. 1110, reducing the
             prosecution's burden of proof and denying defendant a fair trial. We
15           conclude that motive and intent are not synonymous and that the trial
             court properly gave both instructions.2

16               "[I]nstructional error relieving the prosecution of the burden of
             proving beyond a reasonable doubt each element of the charged
17           offense violates the defendant's rights under both the United States
             and California Constitutions." (People v. Flood (1998) 18 Cal.4th
18           470, 479–480.) "An appellate court reviews the wording of a jury
             instruction de novo and assesses whether the instruction accurately
19           states the law." (People v. O'Dell (2007) 153 Cal.App.4th 1569,
             1574.)
20
                 The relevant portion of the section 288(a) instruction, CALCRIM
21           No. 1110, as given here, requires the People to prove the "defendant
             committed the act with the intent of arousing, appealing to, or
22           gratifying the lust, passions, or sexual desires of himself or the
             child." The trial court also instructed the jury with CALCRIM No.
23           370, which states: "The People are not required to prove that the
             defendant had a motive to commit any of the crimes charged. In
24           reaching your verdict you may, however, consider whether the
             defendant had a motive."
25
                 Defendant states, without authority, that motive is an element of a
26           section 288(a) offense. He argues: "To convict a defendant of
             violating section 288, subdivision (a), the prosecution must prove
27           motive, i.e., that his reason for committing the offense was to arouse
             or appeal to his lust, passions or sexual desires, or those of the child.
28           (§ 288, subd. (a).)" With this argument, defendant essentially

                                         26

assumes that intent and motive are the same, but he provides no authority for that proposition. In support of his argument that the jury was improperly instructed with CALCRIM Nos. 370 and 1110, he cites a case involving a statute that includes motive as an element. (*See People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126–1128 [the statute at issue (now § 647.6, subd. (a)(2) ) required the prosecution to prove defendant was " 'motivated by an unnatural or abnormal sexual interest in children' "].)

An appellate brief must "support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) When a party fails to cite authority or present argument, the party forfeits the issue on appeal. (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 949.) An assumption that intent and motive are synonymous is neither authority nor argument.

In any event, motive and intent are not synonymous. They are separate and distinct mental states. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504 (*Hillhouse* ).) In *Hillhouse*, the defendant argued that, because he was charged with specific intent crimes, the trial court erred by instructing that motive is not an element of the charged offenses. The California Supreme Court rejected the argument: "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Ibid.*)

In defendant's reply brief, he attempts to establish that motive and intent are synonymous. But the cases upon which he relies predate *Hillhouse, supra,* 27 Cal.4th 469. Since 2002, the California Supreme Court has never used motive as a synonym for the intent required for a section 288(a) offense. (*See, e.g., People v. Shockley* (2013) 58 Cal.4th 400, 404; *People v. Lopez* (1998) 19 Cal.4th 282, 289.)

Defendant's contention is without merit because giving CALCRIM No. 370 did not negate the intent element of the section 288(a) offense.

People v. Wilson, 2018 WL 2423751, at *2–3

**E. Discussion of Jury Instruction Claim**

Petitioner argues that CALCRIM 370 removed the intent requirement of § 288(a) because "motive" is synonymous with "intent" for purposes of § 288(a).  Therefore, he continues, CALCRIM 370 conflicted with other instructions specifying that an intent finding was required. Petitioner concludes that because the jury may have relied on CALCRIM 370, his due process rights were violated because the jury did not find an essential element of the crimes.

The California Court of Appeal denied petitioner's claim on the grounds that California law does not equate "motive" and "intent" for purposes of § 288(a).  A federal habeas court may

27

1    not reexamine a state court's interpretation and application of state law.  Estelle, 502 U.S. at 67-

2    68.  Petitioner's due process claim depends on a determination that "motive" and "intent" are

3    synonymous under state law.  Because this court is bound by the state court's interpretation of its

4    law, petitioner's federal due process claim is baseless and should be denied.  Even if this court

5    may examine the state law question, for the reasons set forth below, the California Court of

6    Appeal's denial of petitioner's due process claim was not contrary to or an unreasonable

7    application of clearly established federal law under 28 U.S.C. § 2254(d).

8           Petitioner relies on several cases in support of his argument.  He argues that the California

9    Supreme Court in a 1995 case used the terms "motive" and "intent" interchangeably in the

10   context of § 288(a) crimes.  (ECF No. 1 at 51 (citing People v. Martinez, 11 Cal. 4th 434, 452

11   (1995)).)  He also cites to People v. Scott, 11 Cal. 4th 331, 342-343 (1994) (Court describes the

12   purpose of § 288 as protecting "underage victims from a broad range of sexually motivated

13   acts.") and People v. Leversque, 35 Cal. App. 4th 530, 540-541 (1995) (same, citing Scott).

14   Therefore, according to petitioner, when the trial court instructed the jury that motive was not an

15   element of the crime, it essentially removed the intent requirement.

16          The Court of Appeal addressed petitioner's argument by relying in large part on the more

17   recent California Supreme Court case of People v. Hillhouse, 27 Cal. 4th 469 (2002).  The

18   California Supreme Court in Hillhouse addressed the same argument that the CALCRIM 370

19   instruction removed the specific intent requirement.  The Court of Appeal noted that "[t]he

20   California Supreme Court rejected the argument: 'Motive describes the reason a person chooses

21   to commit a crime. The reason, however, is different from a required mental state such as intent

22   or malice.'"  Wilson, 2018 WL 2423751, at *3 (quoting Hillhouse, 27 Cal. 4th at 504).

23          Petitioner challenges the Court of Appeal's reliance on Hillhouse by arguing that the

24   decision in that case was limited to the specific intent requirement for the crimes at issue there –

25   murder, kidnapping, and robbery.  However, the Court of Appeal found that after Hillhouse, "the

26   California Supreme Court has never used motive as a synonym for the intent required for a

27   section 288(a) offense."  Wilson, 2018 WL 2423751, at *3 (citing People v. Shockley, 58 Cal. 4th

28   400, 404 (2013) and People v. Lopez 19 Cal. 4th 282, 289 (1998)).  Petitioner fails to show that,

at the time of his crimes, California law equated "motive" and "intent" for purposes of § 288(a). He has not shown that under California law CALCRIM 370 removed the element of intent from the requirements of § 288(a) and created a conflict with other instructions, a necessary underpinning for petitioner's due process argument.

A jury instruction may violate due process if it "'so infected the entire trial," <u>Estelle</u>, 502 U.S. at 72, that the error "had substantial and injurious effect or influence in determining the jury's verdict," <u>Brecht</u>, 507 U.S. at 637.  Assuming, for the sake of argument, that the definitions of motive and intent are not matters of law and considering the instructions as a whole, this court finds no possibility any juror would have been confused about whether they needed to find petitioner specifically intended to commit the crimes.  Jurors were told they must find defendant acted with "particular" and "specific" intent" and that "intent" would be explained in the instruction for the crime.  (ECF No. 26-8 at 91, 96.)  When the trial judge instructed on the elements of the crime, jurors were told the state must prove that petitioner "committed the act with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of himself or the child."  (ECF No. 26-8 at 101.)  When describing "motive" in CALCRIM 370, the trial court explained that it was a factor that the jury "may" consider.  (ECF No. 26-8 at 100.) These instructions made clear that intent and motive were separate factors – the jury must find intent but could consider motive.

The state court's rejection of petitioner's due process claim was not contrary to or an unreasonable application of clearly established federal law.  The jury instruction claim should be denied.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to

Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed.  See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated:  August 11, 2022

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DB Prisoner Inbox/Habeas/S/wils0591.fr final